Albert F. Maurer Co. v. United States (No. 5144)*

---

United States Court of Customs and Patent Appeals, June 25, 1964.

*Allerton deC. Tompkins,* for appellant.
*John W. Douglas,* Assistant Attorney General, *Andrew P. Vance,* Chief, Customs Section (*Samuel D. Spector, of counsel*) for the United States.
*David A. Golden, amicus curiae.*

[Oral argument February 3, 1964, by Mr. Tompkins, Mr. Vance and Mr. Golden, as amicus curiae]

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Jr., Associate Judges

RICH, Judge, delivered the opinion of the court:

This ▇ appeal is from the judgment of the United States Customs Court, First Division, Appellate Term (A.R.D. 153), affirming the judgment of the trial judge (47 ·Cust. Ct. 560, Reap. Dec. 10130) in a reappraisement proceeding.

We are here concerned with the "flexible tariff provision" of the Tariff Act of 1930, section 336, and a proclamation of President Hoover thereunder of February 1, 1933. The merchandise imported is a species of men's rubber footwear which goes under the common name- of "rubbers" and the particular imports are a kind of men's rubbers first introduced into this country in 1940 from Brazil and known as "Galocha Moderna."

Under the authority of the Presidential proclamation set forth in 63 Treas. Dec. 232, T.D. 46158, the collector appraised the merchandise on the basis of American selling price, as defined in section 402(g) of the Tariff Act of 1930, as amended, of a "like or similar" item of rubber footwear produced by the Tingley Rubber Company of Rahway, New Jersey, hereinafter referred to as the "Tingley rubbers."

The judgment of the trial court was that this appraisement was correct, the importer applied for and obtained review thereof, and the judgment of the trial court was affirmed in all respects.

At the trial, the importer produced three witnesses, the appraiser of the imported rubbers, a Mr. Josetti who claimed to have introduced the Galocha Moderna into the United States and who during all times relevant to this case has been connected with the Brazilian Consulate, and a Mr. Robinette who operated a testing laboratory and who testified as to comparative tests he had made on the imports and on the Tingley rubbers with a view to showing the differences between them.

In addition to the briefs of the parties, a most helpful amicus brief has been filed herein by Lamb & Lerch, representing the Footwear Division of the Rubber Manufacturers Association who also appeared in the trial court and obtained permission to file a brief there. The amicus supports the view of the Government which is that the appraised value is $1.71 per pair less 2% packed, that being the American selling price of the Tingley rubbers.

The parties have stipulated that should it be found that American selling price is not the proper basis of appraisal, then the export value is $1.25 per pair and that foreign value is not higher.

Appellant's principal argument, to which half of its brief is devoted, is that there are no "like or similar" American rubbers. A part of this argument is, specifically, that the Tingley rubbers on which the collector based his appraisal are not "like or similar" to the imports.

We are faced at the outset with a question of our jurisdiction to review this particular issue which we raise sua sponte. Section 501, Tariff Act of 1930, limits our review in reappraisement proceedings to "a question or questions of law only." *United States* v. *Eurasia Import Co.*, 33 CCPA 123, 125, C.A.D. 326.

The trial court herein made findings of fact and conclusions of law which were adopted and confirmed by the Appellate Term. "Finding of Fact" No. 5 was:

That the low cut rubber overshoe manufactured by Galocha Moderna, Inc., *is similar* to the low cut rubber overshoe manufactured by Tingley Rubber Co., within the intent of Congress under section 336 of the Tariff Act of 1930. [Our emphasis.]

There was no "Conclusions of Law" specific to the question of likeness or similarity.

It is our view that the question of "similarity" is not a fact question in this case. The answer to it rests on an application of the statute to the merchandise, on the basis of *the characteristics of the merchandise which have been established in the case as facts*, and as such "similarity" is a question of law. The inclusion of the answer to this question among the findings of fact below, rather than in the conclusions of law, is not determinative of its proper characterization and as a question of law we review it. We are aware that in prior opinions of this court there exists some confusion as to whether this is a question of fact or law.

What this issue involves is a determination of whether the Galocha Moderna rubbers are "like or similar" to the Tingley rubbers within the meaning of the enabling statute, section 336, and the Presidential Proclamation, T.D. 46158, wherein that expression occurs. ▮ In deciding this issue our primary objective, of course, is to carry out the intent of Congress in enacting this particular law and to give the words the meaning they were apparently intended to have in this particular context. This is not necessarily the meaning that the same words may have in other contexts, in other parts of the Tariff Act having other objects.

We can first dispose of whether the two kinds of rubbers here are "like" each other. Appellant cities a dictionary meaning of "like" and precedents indicating that it means that the goods are either the same or nearly the same. In view of the alternative that they are "similar," which expression has a broader connotation, we do not have to decide whether the goods are "like." In *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T.D. 42714, this court, in considering the term "such or similar" in section 402(b), Tariff Act of 1922, pointed out that "similar" could not be given the same meaning as "such" for to do so would make its presence in the statute superfluous and that we cannot proceed on a theory that Congress employs useless and unnecessary language in drafting statutes—at least under ordinary circumstances. To give the statute full effect, "similar" was therefore given a broader construction. The situation is the same here. If we assume that "like" means the same, it is clear that the Moderna and Tingley rubbers are not the same, as will presently appear. The only question we must decide, therefore, is whether they should be held to be "similar" under the law here involved, as the lower courts did.

The court has before it samples of Galocha Moderna and Tingley rubbers, evidence of measurements and tests made on them by a testing laboratory, and opinion evidence of witnesses as to similarities and

differences. The samples are the most potent witnesses. We will first describe what the rubbers have in common. Both are molded gum-rubber men's rubbers, full size as distinguished from half-rubbers, and notwithstanding the lower court's characterization as "low cut rubber overshoe." They are unlined, unreinforced, and without tabs at the front of the top or "lip" opening. They are translucent (except the black version of Galocha Moderna which was an earlier model) and provided on their tread surfaces with non-skid patterns. The designs of the rubbers differ in numerous mechanical and functional details as shown in the following table:

| TEST | MODERNA | TINGLEY |
|---|---|---|
| Weight | 144. 4 gms. | 170. 2 gms. |
| Hardness (Shore Durameter) | 65. | 35. |
| Anti-skid force dry | 19. 25 lbs. | 11. 25 lbs. |
| Anti-skid force wet | 16. 5 lbs. | 11. 75 lbs. |
| Holding properties | | |
| Removal starts | 3. 5 lbs. tension | 0— lbs. tension |
| Force to remove | 8. 75 lbs. tension | 2. 00 lbs. tension |
| Lip opening | 9 sq. in. | 13. 00 sq. in. |

By way of explanation, Moderna is a little lighter, its rubber is a little harder, its bottom pattern gives it better anti-skid properties, it takes more force to pull it off of a shoe, and its top or "lip" opening is smaller in area. Some of these details are related to a new concept underlying its design, as explained in United States patent, No. 2,108,656, issued February 15, 1938, to Joaquin de Noronha, of Rio de Janeiro, Brazil. This concept was to use a rubber overshoe of oversize dimensions, to provide air space between the shoe and the rubber, and provide it with means for retaining it on the shoe. This means is the smaller than usual top opening of elastic rubber. Thus the rubber, though over-size, fits tightly around the top of the shoe, there is a greater circulation of air inside the rubber, and allegedly greater foot comfort in hot weather.

The final difference which should be noted is the "modern" design of the Moderna as compared to the entirely conventional appearance of the Tingley rubbers which are of shoe-fitting shape. The modern-ization resides in breaking up the surfaces of the rubber into a number of flat planes with largely straight-line junctions. The appearance of the Moderna and Tingley rubbers is clearly distinct. It may also fairly be surmised that a purchaser who had made up his mind to buy a modern-looking Galocha Moderna might not be satisfied to take in its place a Tingley rubber. Vice versa, one who preferred the con-ventional appearance of the Tingley rubber might be quite unwilling to take the Moderna. But otherwise both kinds function as rubbers.

In summary, it is quite clear that the imported and the American

rubbers have many points of similarity and many points of dissimilarity. They both serve the same purpose, to keep the feet dry. They are made of substantially the same material. Both are flexible enough to fold up and stuff in a case or pocket. Though there is a measurable difference in hardness according to the evidence, it would not be apparent to the average customer.

The true question here, as we see it, is whether, in order to carry out the intent of Congress in enacting the flexible tariff law, section 336, we should affirm the holding that the Moderna and Tingley rubbers are legally "similar" notwithstanding their differences.

We must not lose sight of the basic fact that the purpose of the Presidential Proclamation of 1933, and the statutory purpose which it implemented, was protection of American manufacturers and labor from foreign price competition with respect to the goods named in the proclamation. Among those goods was "footwear, wholly * * *. of india rubber * * *." The proclamation increased the tariff on such goods to 25% ad valorem based upon the *American selling price of* "like or similar articles" made in the United States. Surely the underlying principle is to protect American manufacturers from foreign competition where foreign goods sufficiently "similar" to them to compete with them are imported. *H. H. MacDonaugh & Co. v. United States*, 38 CCPA 36, C.A.D. 436. If the collector can find no American article sufficiently similar to the one imported to create market competition with it, obviously no one is going to be disadvantaged, there is no point in applying the proclamation, and as a matter of law it would not apply. On the other hand, where imports are sufficiently similar to American goods to compete directly with them, and the goods are within a category named in the proclamation, it would seem to be within the intent of Congress that they receive the protection the proclamation was intended to afford. The whole scheme was to protect specified American manufactures whenever and if foreign competing merchandise came in by charging the latter with an ad valorem duty based on American selling price of the American-made protected articles, in the words of the statute itself, in order to "equalize the differences in the costs of production of the domestic article and the like or similar foreign article * * *."

In taking into consideration the basic purpose behind section 336, we do not give much weight to prior adjudications involving the meaning of the word "similar" as it is used in other provisions of the Tariff Act. The problem is one of economics, not semantics. It therefore serves no useful purpose and only creates confusion to discuss all the shades of meaning of the word "similar" or how it has been construed in other cases involving other sections of the statutes.

■ The principle that goods may be legally "similar" for the purposes of section 336 notwithstanding the existence of numerous differences has been established in prior decisions. *Japan Import Co.* v. *United States*, 24 CCPA 167, T.D. 48642, involved the same proclamation as the present case and the imports were canvas-top, rubber-sole shoes. There was evidence of dissimilarity of the American shoes on the basis of which they were valued. This court nevertheless affirmed the holding of legal similarity, remarking:

The evidence, however, did show that the imported shoes and the domestic shoes were sold in the same establishments, to the same class of customers, and were adapted for the same uses and purposes.

*Mutual Supply Co.* v. *United States*, 38 CCPA 44, C.A.D. 437, affirmed a judgment of the Customs Court, Appellate Term, which reversed a decision of the trial court holding there were so many differences between two kinds of canned clams that they were not "similar." Thus the ultimate finding was legal similarity notwithstanding many differences.

In the present case we hold, as did both lower courts, that Galocha Moderna are "similar" to the Tingley rubbers notwithstanding the differences shown by the evidence. We do so because they are both men's molded gum-rubber overshoes, adapted to the same uses, sold to the same purchasers through the same channels of trade, and because the imported rubbers are certainly competitive with the domestic product. The fact that the modern appearance and possible advantages of the imported rubbers may make them *better* in the eyes of and preferred by some customers only serves to make them *more* competitive and is but added reason to preserve the economic protection contemplated by Congress in enacting section 336.

Appellant makes several other contentions in addition to the one just disposed of. They are that Congress has gone beyond its constitutional power, that the President has usurped a legislative function, and that the description of the product in the Presidential Proclamation is too broad.

As to the constitutional question, we cannot find from appellant's brief just what the contention is. If it is something Congress did, as alleged, it must be that section 336 is alleged to be unconstitutional, but appellant never says so. Since Congress did no more than to enact the statute, we take the argument to be that the statute is unconstitutional and decide the point by saying that we consider the matter as having been settled by *Hampton, Jr., & Co.* v. *United States*, 14 CCPA 350, T.D. 42030, affirmed 276 U.S. 394, and *Japan Import Co.* v. *United Stats*, supra.

The argument based on alleged presidential usurpation of legislative function seems to be that no investigation has ever been made

by the Tariff Commission on "this unique overshoe," the Galocha Moderna. We think it was settled that this was not necessary and that proclamations under section 336 relate to future imports not known at the time of proclamation by the decision in *H. H. Mac-Donaugh & Co.* v. *United States*, supra.

The contention that the language of the Presidential Proclamation which names the goods is too broad is nothing more than a contention. No authority is cited. We see no reason why the broad language used was not within the power delegated to the President. The specific language of the proclamation complained of is:

boots, shoes, or other footwear, wholly or in chief value of india rubber, provided for in paragraph 1537(b) * * *.

Appellant's complaint is:

The language of his [the President's] proclamation covers every conceivable type of india rubber footwear known to man; it covers everything, *but everything*.

Actually it covers only imported articles of india rubber footwear which sufficiently resemble articles of American manufacture to compete with them. If the Tariff Commission investigation showed that the india rubber footwear industry was being injured by competition from imports, we see no reason for restricting the proclamation to specific articles and appellant has shown us none. Moreover, the proclamation itself shows on its face that the Tariff Commission "has investigated the differences in costs of production of, and all other facts and conditions enumerated in said section [336] with respect to" the precise field covered by the proclamation. See *H. H. Mac-Donaugh & Co.* v. *United States*, supra. Appellant seems to assume that the investigation made and the field affected were not commensurate but has not shown this to be so.

The judgment of the Customs Court is *affirmed*.